JUDGE DAVID GUADERRAMA

FILED
2024 MAR -5 AM 11:26
CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY [signature] DEPUTY

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

| | |
|---|---|
| **MANUEL GUADIAN,** | § |
| **Plaintiff,** | § |
| **v.** | § |
| **PHILIP SELLERS P.C.,** a Texas Professional Corporation, and **UPSIDE LEGAL, LLC,** a Texas Limited Liability Company | § |
| **Defendants.** | § |

EP24CV0074

**PLAINTIFF'S ORIGINAL COMPLAINT**

Pro Se Plaintiff Manuel Guadian files this Complaint against Defendants PHILIP SELLERS P.C. and UPSIDE LEGAL, LLC for violations of (1) the Federal Telephone Consumer Protection Act ("TCPA") and its regulations and the (2) the Texas Business and Commerce Code "TBCC" law governing telephone solicitations, alleging as follows.

**PARTIES**

1. Plaintiff MANUEL GUADIAN ("Plaintiff") is a natural person and is a citizen of the Western District of Texas and was present in the Western District of Texas during all calls at issue in this case.

2. Defendant PHILIP SELLERS P.C., ("Sellers") is a Professional Corporation organized and existing under the laws of Texas and can be served via its registered agent Philip Sellers at 2777 Allen Parkway, Suite 1000 Houston, TX 77019.

3. Defendant UPSIDE LEGAL, LLC ("Upside") is a limited liability company organized and existing under the laws of Texas and can be served via its registered agent Registered

Agents Inc. at 5900 Balcones Drive Ste 100 Austin TX, 78731.

4. Defendants UPSIDE LEGAL, LLC and PHILIP SELLERS P.C are hereinafter referred to collectively as ("Defendants").

**JURISDICTION AND VENUE:**

5. This Court has federal subject matter jurisdiction under 28 U.S.C. § 1331, as this case arises under the Telephone Consumer Protection Act, 47 U.S.C. § 227, which is a federal statute.

6. This Court has supplemental subject matter jurisdiction over Plaintiff's claim arising under Texas Business and Commerce Code 305.053 because that claim arises from the same nucleus of operative fact, i.e., Defendants' telemarketing calls to Plaintiff, and adds little complexity to the case, so it is unlikely to predominate over the TCPA claims.

7. This Court has personal jurisdiction over the Defendants because they conduct business in this District and in the State of Texas and because the events giving rise to this lawsuit occurred in this District.

8. Venue is proper in this District pursuant to 28 U.S.C. §1391(b) because Defendants regularly conduct business in the State of Texas and in this District, and because the wrongful conduct giving rise to this case occurred in this District.

**THE TELEPHONE CONSUMER PROTECTION ACT OF 1991, 47 U.S.C. § 227**

9. In 1991, Congress enacted the TCPA to restrict the use of sophisticated telemarketing equipment that could target millions of consumers *en masse*. Congress found that these calls were not only a nuisance and an invasion of privacy to consumers specifically but were also a threat to interstate commerce generally. *See* S. Rep. No. 102-178, at 2-3 (1991), as reprinted in 1991 U.S.C.C.A.N. 1968, 1969-71.

10. The TCPA makes it unlawful "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using an automatic telephone dialing system or an artificial or prerecorded voice … to any telephone number assigned to a … cellular telephone service." 47 U.S.C. § 227(b)(1)(A)(iii).

11. The TCPA makes it unlawful "to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party, unless the call is initiated for emergency purposes, is made solely pursuant to the collection of a debt owed to or guaranteed by the United States or is exempted by rule or order" of the Federal Communication Commission ("FCC"). 47 U.S.C. § 227(b)(1)(B).

12. The TCPA provides a private cause of action to persons who receive calls in violation of § 227(b). 47 U.S.C. § 227(b)(3).

13. Separately, the TCPA bans making telemarketing calls without a do-not-call policy available upon demand. 47 U.S.C. § 227(c); 47 C.F.R. § 64.1200(d)(1).[1]

14. The TCPA provides a private cause of action to persons who receive calls in violation of § 227(c) or a regulation promulgated thereunder. 47 U.S.C. § 227(c)(5).

15. According to findings of the FCC, the agency vested by Congress with authority to issue regulations implementing the TCPA, automated or prerecorded telephone calls are a greater nuisance and invasion of privacy than live solicitation calls and can be costly and inconvenient.

16. The FCC also recognizes that "wireless customers are charged for incoming calls whether they pay in advance or after the minutes are used." *In re Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 FCC Rcd. 14014, 14115 ¶ 165 (2003).

---

[1] *See* Code of Federal Regulations, Title 47, Parts 40 to 60, at 425 (2017) (codifying a June 26, 2003 FCC order).

17. The FCC requires "prior express written consent" for all autodialed or prerecorded telemarketing robocalls to wireless numbers and residential lines. In particular:[A] consumer's written consent to receive telemarketing robocalls must be signed and be sufficient to show that the consumer: (1) received clear and conspicuous disclosure of the consequences of providing the requested consent, *i.e.*, that the consumer will receive future calls that deliver prerecorded messages by or on behalf of a specific seller; and (2) having received this information, agrees unambiguously to receive such calls at a telephone number the consumer designates. In addition, the written agreement must be obtained without requiring, directly or indirectly, that the agreement be executed as a condition of purchasing any goods or service.

18. *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 27 FCC Rcd. 1830, 1844 ¶ 33 (2012) (footnote and internal quotation marks omitted). FCC regulations "generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." *In the Matter of Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 10 FCC Rcd. 12391, 12397 ¶ 13 (1995).

19. The FCC confirmed this principle in 2013, when it explained that "a seller …may be held vicariously liable under federal common law principles of agency for violations of either section 227(b) or section 227(c) that are committed by third-party telemarketers." In the Matter of the Joint Petition Filed by Dish Network LLC, 28 FCC Rcd. 6574, 6574 ¶ 1 (2013).

20. Under the TCPA, a text message is a call. *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663 (2016).

## FACTUAL ALLEGATIONS

21. Plaintiff successfully registered his personal cell phone number ending in -8351 on the National Do-Not-Call Registry since April 6, 2023, which was more than 31 days prior to receiving the alleged calls.

22. Plaintiff is the residential subscriber of the cell phone number -8351. Plaintiff makes and takes residential calls with this number in his home on a daily basis.

23. Plaintiff never asked the National Do-Not-Call Registry administrator to remove his phone number -8351 from the National Do-Not-Call Registry and Plaintiff was on the National Do-Not-Call Registry at all times relevant to this Complaint.

24. Plaintiff registered his phone number on the Do Not Call list in order to obtain solitude from invasive and harassing telemarketing calls. The alleged telemarketing calls prevented Plaintiff from using his phone for legitimate purposes.

25. Defendant Sellers is owned and operated by Philip Sellers.

26. Defendant Upside is owned and operated by Brian Lemelin.

27. Defendant Sellers is barred by ethics from making direct solicitation phone calls to consumers with whom no preexisting relationship exists.

28. Defendant Sellers contracted with Upside to make solicitation phone calls on behalf of Sellers because Sellers is barred from making these calls themselves and in an effort to evade ethics violations.

29. Upside makes solicitation telephone calls on behalf of Defendant Sellers at the direction, instruction, and guidance of Defendant Sellers.

30. Defendant Sellers provides Upside with calling lists to thousands of consumers' residential phone numbers.

31. Defendant Sellers instructs Upside to call the phone numbers on the calling lists provided by Sellers.

32. Defendant Sellers provides Upside with qualifications a consumer must meet to qualify for Defendant Sellers debt relief services.

33. Defendant Sellers authorizes Upside to act as Sellers agent by instructing Upside on how much to charge a new client and sending the new client a retainer agreement to sign on behalf of Defendant Sellers.

34. Defendant Sellers pays Defendant Upside a commission fee for every new client Defendant Upside generates for Defendant Sellers.

35. Defendants Upside and Sellers make substantial profit gains through illegal telemarketing.

36. Through the month of January 2024, Plaintiff received at least eleven (11) solicitation phone calls to his cell phone ending in 8351 from Upside offering debt relief services on behalf of Defendant Sellers.

37. Plaintiff never requested information regarding debt relief services,

38. Plaintiff did not provide his prior express written consent to receive any of the alleged calls.

39. None of the alleged calls were made to Plaintiff for emergency purposes.

40. On each and every alleged call, Defendant Upside's telemarketers and/or agents failed to properly identify themselves and on who's behalf they were calling.

41. Defendants Sellers and Upside knew or should have known the requirements for making telemarketing calls and thus knew or should have known that the alleged calls complained of herein violated the TCPA and its regulations.

42. Table A below summarizes the alleged calls Plaintiff received from Upside on behalf of Defendant Sellers.

**- 8351**

| | | | |
|---|---|---|---|
| 1/9/2024 | 915-587-1982 | 1:19 PM | UPSIDE TELEMARKETER SHAWN ADV STOP CALLING |
| 1/10/2024 | 701-414-8978 | 10:16 AM | UPSIDE TELEMARKETER |
| 1/11/2024 | 302-305-8057 | 10:25 AM | UPSIDE TELEMARKETER |
| 1/12/2024 | 281-524-7740 | 7:32 AM | UPSIDE TELEMARKETER |
| 1/13/2024 | 743-400-3258 | 5:25 PM | UPSIDE TELEMARKETER |
| 1/15/2024 | 843-733-5427 | 11:26 AM | UPSIDE TELEMARKETER |
| 1/16/2024 | 207-718-1052 | 4:42 PM | UPSIDE TELEMARKETER |
| 1/17/2024 | 541-394-8024 | 12:32 PM | UPSIDE TELEMARKETER |
| 1/19/2024 | 859-350-9432 | 4:16 PM | UPSIDE TELEMARKETER |
| 1/22/2024 | 304-408-3621 | 8:27 AM | UPSIDE TELEMARKETER |
| 1/22/2024 | 850-208-0571 | 3:30 PM | UPSIDE TELEMARKETER LIVE TRANSFER TO FRITZIE ON BEHALF OF PHILIP SELLERS P.C. |

43. **Call #11** – On January 22, 2024, at 3:30 PM. Plaintiff became annoyed and frustrated by the calls and feigned interest in debt relief services for the sole purpose of identifying who the telemarketers from Upside were calling on behalf of.

44. **Call #11** – Plaintiff investigated the call with a telemarketer named Mark from Upside.

45. Mark asked Plaintiff qualifying questions provided by Sellers regarding Plaintiff's debt.

46. Mark from Upside then transferred Plaintiff to an agent from Upside named Fritzie.

47. Fritzie asked Plaintiff more qualifying questions and solicited Plaintiff for a debt relief program on behalf of Defendant Sellers.

48. Plaintiff received an email from Fritzie that contained a retainer agreement from Defendant Sellers for Plaintiff to sign. *See Exhibit A.*

49. On or about February 15, 2024, Plaintiff sent an email to Philip Sellers to phil@pspc-law.com advising Mr. Sellers of unauthorized telemarketing calls Plaintiff received to his cell phone 8351 from Upside on behalf of Defendant Sellers.

50. Plaintiff received a read receipt to the email Plaintiff sent Mr. Sellers.

51. Mr. Sellers did not deny the calls Plaintiff received from Upside calling on behalf of Defendant Sellers.

52. Defendant Sellers was on notice that Upside was making unauthorized telemarketing calls to Plaintiff's cell phone 8351 on behalf of Defendant Sellers.

53. Defendant Sellers continues to use Upside to tele solicit Sellers's debt relief services.

54. Defendants Upside and Seller's agents and/or telemarketers employ outrageous, aggressive, and illegal sales techniques that violate multiple federal laws and state consumer statues.

55. Defendants Upside and Sellers has knowledge of and has adopted and maintained TCPA violations as a sales strategy.

56. Defendant Sellers knew full well that Defendant Upside was calling and harassing consumers in an attempt to procure business on behalf of the Defendant Sellers.

57. Defendant Sellers refuses to take any action to stop or curtail the unlawful sales practices that violate the TCPA because these practices benefit Defendants Upside and Sellers financially.

58. Defendants Upside and Sellers are not registered pursuant to § 302.101 of the Texas Business & Commerce Code to provide telephone solicitations. The https://direct.sos.state.tx.us/telephonesearch.asp site ("Texas Registration Database") does not contain Defendants Upside or Sellers's registration.

59. Defendants Upside and Sellers do not qualify for an exemption under § 302.053.

60. Upon information and belief, Defendant Sellers did not train Defendant Upside who engaged in telemarketing on behalf of Defendant Sellers, on the existence and use of Defendant Sellers's internal do not call policy as Upside failed to recognize Plaintiff's personal cell phone 8351 is registered on the National Do-Not-Call Registry.

61. Plaintiff was harmed by the calls. Plaintiff was temporarily deprived of legitimate use of his phone because the phone line was tied up during the telemarketing calls and his privacy was improperly invaded. Moreover, these calls injured Plaintiff because they were frustrating, obnoxious, annoying, were a nuisance and disturbed the solitude of Plaintiff.

62. The calls caused Plaintiff's cell phone battery's depletion, used up cellular data, and prevented Plaintiff from otherwise using his telephone for lawful purposes.

## VICARIOUS LIABILITY OF DEFENDANT SELLERS

63. Defendant Sellers is vicariously liable for the telemarketing calls that generated the lead on their behalf.

64. The FCC is tasked with promulgating rules and orders related to enforcement of the TCPA. 47 U.S.C. § 227(b)(2).

65. The FCC has explained that its "rules generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." *In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, 10 FCC Rcd. 12391, 12397 ¶ 13 (1995).

66. The FCC reiterated that a company on whose behalf a telephone call is made bears the responsibility for any violations. *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 23 FCC Rcd. 559, 565 ¶ 10 (2008) (recognizing "on behalf

of" liability in the context of an autodialed or prerecorded message call sent to a consumer by a third party on another entity's behalf under 47 U.S.C. § 227(b)).

67. The FCC confirmed this principle in a declaratory ruling holding that sellers such as Post may not avoid liability by outsourcing telemarketing:

> [A]llowing the seller to avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties would leave consumers in many cases without an effective remedy for telemarketing intrusions. This would particularly be so if the telemarketers were judgment proof, unidentifiable, or located outside the United States, as is often the case. Even where third-party telemarketers are identifiable, solvent, and amenable to judgment limiting liability to the telemarketer that physically places the call would make enforcement in many cases substantially more expensive and less efficient, since consumers (or law enforcement agencies) would be required to sue each marketer separately in order to obtain effective relief. As the FTC noted, because sellers may have thousands of independent marketers, suing one or a few of them is unlikely to make a substantive difference for consumer privacy.

*In re DISH Network, LLC*, 28 FCC Rcd. 6574, 6588 ¶ 37 (2013) (footnote omitted) (alteration marks and internal quotation marks omitted).

68. More specifically, *Dish* held that, even in the absence of evidence of a formal contractual relationship between the seller and the telemarketer, a seller is liable for telemarketing calls if the telemarketer "has apparent (if not actual) authority" to make the calls. *Id.* at 6586 ¶ 34.

69. The ruling rejected a narrow view of TCPA liability, including the assertion that a seller's liability requires a finding of formal agency and immediate direction and control over the third-party who placed the telemarketing call. *Id.* at 6587 ¶ 36 & n.107.

70. To the contrary, the FCC—armed with extensive data about robocalls and Americans' complaints about them—determined that vicarious liability is essential to serve the TCPA's

remedial purpose of protecting Americans from "unwanted telemarketing invasions." *Id.* at 6587 ¶ 36.

71. Vicarious liability is important because reputable, traceable, and solvent companies that benefit from illegal telemarketing are "in the best position to monitor and police TCPA compliance by third-party telemarketers." *Id.* at 6588 ¶ 37.

72. Defendant Sellers is legally responsible for ensuring that Defendant Upside makes telemarketing calls on behalf of Defendant Sellers comply with the TCPA when so doing.

73. Defendant Sellers knowingly and actively accepted new business from Defendant Upside that originated through illegal telemarketing.

74. Defendant Sellers knew (or reasonably should have known) that Defendant Upside was violating the TCPA on their behalf but failed to take effective steps within their power to force Defendant Upside to cease that conduct.

75. By hiring a company to make calls on its behalf, Defendant Sellers "manifest[ed] assent to another person . . . that the agent shall act on the principal's behalf and subject to the principal's control" as described in the Restatement (Third) of Agency ("Restatement").

76. Moreover, Defendant Sellers maintained interim control over the actions of Defendant Upside.

77. For example, Defendant Sellers had absolute control over whether, and under what circumstances, they would accept a client from Defendant Upside.

78. Furthermore, Defendant Sellers had day-to-day control over the actions of Defendant Upside, including the ability to require them to respect the National Do Not Call Registry.

79. Defendant Sellers also gave interim instructions to Defendant Upside by providing lead-qualifying instructions and lead volume limits.

80. Defendant Sellers donned Defendant Upside with apparent authority to make the calls at issue. Thus, Defendant Upside pitched Defendant Seller's debt relief services in the abstract.

81. Apparent authority turns on whether a third party believes the principal authorized its agent to act and the belief is "traceable" to a manifestation of the principal. Restatement § 2.03 cmt. c.

82. "[A]pparent authority can arise in multiple ways and does *not* require that 'a principal's manifestation must be directed to a specific third party in a communication made directly to that person.'" *Dish*, 28 FCC Rcd. at 6586 ¶ 34 n.102 (quoting Restatement § 2.03 cmt. c).

83. A principal may make a manifestation "by directing an agent to make statements to third parties or directing or designating an agent to perform acts or conduct negotiations, placing an agent in a position within an organization, or placing an agent in charge of a transaction or situation." Restatement § 2.03 cmt. c.

84. Defendant Upside transferred customer information, including Plaintiff's contact information, directly to Defendant Sellers. Thus, Defendant Upside had the "ability . . . to enter consumer information into Seller's sales or customer systems," which the FCC has explained to show apparent agency. *Dish*, 28 FCC Rcd. at 6592 ¶ 46.

85. Finally, the FCC has held that called parties may obtain "evidence of these kinds of relationships . . . through discovery, if they are not independently privy to such information." *Id.* at 6592-93 ¶ 46. Evidence of circumstances pointing to apparent authority on behalf of the telemarketer "should be sufficient to place upon the seller the burden of demonstrating that a reasonable consumer would not sensibly assume that the telemarketer was acting as the seller's authorized agent." *Id.* at 6593 ¶ 46.

86. Defendant Sellers is the liable party as the direct beneficiary of the illegal telemarketing calls as they stood to gain Plaintiff as a client when Defendant Upside solicited Plaintiff for a debt relief services on behalf of Defendant Sellers.

**THE TEXAS BUSINESS AND COMMERCE CODE 305.053**

87. The Texas Business and Commerce code has an analogous portion that is related to the TCPA and was violated in this case.

88. The Plaintiff may seek damages under this Texas law for violations of 47 USC 227 or subchapter A and seek $500 in statutory damages or $1500 for willful or knowing damages.

**VIOLATIONS OF THE TEXAS BUSINESS AND COMMERCE CODE § 302.101**

89. The actions of the Defendant Sellers violated the Texas Business and Commerce Code 302.101 by authorizing Defendant Upside to place solicitation phone calls to a Texas resident on behalf of Defendant Sellers without having a registration certificate and bond on file with the Texas Secretary of State.

90. Texas Business and Commerce Code § 302.101 provides a private right of action. A violation of Chapter 302 "is a false, misleading, or deceptive act or practice under Subchapter E, Chapter 17" and is enforceable as such: "A public or private right or remedy prescribed by Subchapter E, Chapter 17, may be used to enforce [Chapter 302." Tex. Bus. & Com. Code § 302.303.

91. The use or employment by any person of a false, misleading, or deceptive act or practice" causes "economic damages or damages for mental anguish." Tex. Bus. & Com. Code § 17.50.

92. Texas Business and Commerce Code §302.101 states that a person (1) "may not make a telephone solicitation" (a) "from a location in [Texas]" or (b) "to a purchaser located in [Texas]," (2) "unless the [person] holds a registration certificate for the business location from which the

telephone solicitation is made." Tex. Bus. & Com. Code § 302.101(a).

93. Under Texas Business and Commerce Code § 302.302 Plaintiff is entitled to seek damages of up to $5000 per violation of §302.101.

**INJURY, HARM, DAMAGES, AND ACTUAL DAMAGES**
**AS A RESULT OF THE CALLS**

94. Plaintiff has been denied the use of his phone, enjoyment of his phone, and had the functionality of his phone decreased because of unnecessary charging, erosion of phone memory, and had his privacy invaded by the harassing telemarketing calls.

95. The calls harmed the Plaintiff by causing the very harm that Congress sought to prevent a "nuisance and invasion of privacy."

96. Plaintiff has been annoyed, harassed, and irritated by unauthorized calls placed to him on behalf of Defendant Sellers.

97. The calls harmed the Plaintiff by trespassing upon and interfering with Plaintiff's rights and interests in Plaintiff's cellular telephone by placing unwanted telemarketing calls to the Plaintiff.

**COUNT ONE:**
**(Violation of the TCPA "Sales Call/DNC" Prohibition, 47 U.S.C. 227(c), and 47 C.F.R. § 64.1200(C))**
**(All Defendants)**

98. Plaintiff realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

99. Defendants' telemarketers and/or agents called Plaintiff's private residential telephone number which was successfully registered on the National Do-Not-Call Registry more than

thirty-one (31) days prior to the calls for the purposes of commercial solicitation, in violation of 47 U.S.C. § 227(c)(3)(F), and 47 C.F.R. § 64.1200(c)(2).

100. Plaintiff was statutorily damaged at least eleven (11) times under 47 U.S.C. § 227(c)(3)(F) by the Defendants by the telemarketing calls described above, in the amount of $500.00 per call.

101. Plaintiff was further statutorily damaged because the Defendants' willfully and/ or knowingly violated this subsection of the TCPA. Plaintiff requests that the court treble the damage amount as permitted under U.S.C. § 227(c)(5) for each and every willful and/or knowing violation.

102. Plaintiff is entitled to an award up to $1,500 in damages for each knowing or willful violation of 47 U.S.C. § 227(c)(3)(F).

## COUNT TWO:

**(Violations of The Texas Business and Commerce Code 305.053)**
**(All Defendants)**

103. Plaintiff incorporates the foregoing allegations as if set forth herein.

104. The foregoing acts and omissions of Defendants' telemarketers and/or agents constitute multiple violations of the **Texas Business and Commerce Code 305.053**, by making non-emergency telemarketing calls to Plaintiff's cellular telephone number without his prior express written consent in violation of 47 U.S.C. § 227 et seq.

105. Plaintiff seeks for himself an award of at least $500.00 in damages for each such violation. **Texas Business and Commerce Code 305.053(b).**

106. Plaintiff seeks for himself an award of up to $1,500.00 in damages for each such knowing or willful violation. **Texas Business and Commerce Code 305.053**(c).

**COUNT THREE:**

**(Violations of Texas Business and Commerce Code 302.101)**
**Failure to obtain a Telephone Solicitation Registration Certificate**
**(All Defendants)**

107. Plaintiff incorporates and realleges, as though fully set forth herein, each of the paragraphs above.

128. Defendants' telemarketers and/or agents made at least eleven (11) solicitation sales calls to Plaintiff without having a valid telephone solicitation as required under Tex. Bus. Com. Code 302.101.

129. As a result of Defendants' telemarketers and/or agents' violations of Tex. Bus. and Com. Code 302.101 Plaintiff may seek damages of up to $5,000 for each violation. Tex. Bus. and Com. Code 302.302(a).

130. As a result of Defendants' telemarketers and/or agents violations of Tex. Bus. and Com. Code 302.101 Plaintiff may seek all reasonable costs of prosecuting this action, including court costs, deposition costs, and witness fees.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Manuel Guadian prays for judgment against the Defendants jointly and severally as follows:

A. Leave to amend this Complaint to name additional DOESs as they are identified and to conform to the evidence presented at trial;

B. A declaration that actions complained of herein by the Defendants violates the TCPA and Texas state law;

C. An injunction enjoining the Defendants and their affiliates and agents from engaging in the unlawful conduct set forth herein;

D. An award of $1500 per call in statutory damages arising from the TCPA §227(c) intentional violations jointly and severally against the corporations for eleven (11) calls.

E. An award of $1,500 in statutory damages arising from violations of the Texas Business and Commerce code 305.053 intentional violations jointly and severally against the corporations for eleven (11) calls.

F. An award of $5,000 in statutory damages arising from violations of the Texas Business and Commerce code 302.101 intentional violations jointly and severally against the corporations for eleven (11) calls.

G. An award to Mr. Guadian of damages, as allowed by law under the TCPA and Texas state law;

H. An award to Mr. Guadian of interest, costs, and attorneys' fees, as allowed by law and equity

I. Such further relief as the Court deems necessary, just, and proper.

March 5, 2024,

Respectfully submitted,

Manuel Guadian
Plaintiff, Pro Se
3805 Tierra Fiji Ln
El Paso, Texas 79938
915-588-8351
maguadianjr@gmail.com

# EXHIBIT A

**Philip Sellers, P.C.**

Mailing Address:
PO Box 3777
Rancho Cucamonga, CA 91729

PHONE NUMBER:
(800) 304-1655

PHILIP A. SELLERS (TX)

ASSOCIATED ATTORNEYS
NETWORK OF ATTORNEYS
(AL ,AR ,AZ ,CA ,CO ,CT ,DC ,DE ,FL ,GA ,IA ,ID ,IL ,IN ,KS ,KY ,LA ,MA ,MD ,ME ,MI ,MN ,MO ,MS ,MT ,NC ,ND ,NE ,NH ,NJ ,NM ,NV ,NY ,OH ,OK ,OR ,PA ,RI ,SC ,SD , TN ,TX ,UT ,VA ,VT ,WI ,WV ,WY )

January 22, 2024

Manuel Guadian
3805 Tierra Fiji Ln
El Paso, TX 79938

Dear Manuel,

Thank you for contacting our firm. Our practice focuses on legally resolving debt issues with your creditors. Our law firm is dedicated to reducing the stress created by debt collectors, and the fear of having to file for bankruptcy.

Once you review and sign the attached documents, which include a Legal Services Agreement, an Account Administration Agreement and a Power of Attorney, we will take the following steps:

- All creditors will be notified of our law firm's "power of attorney" to represent you regarding your Claims. This means you should experience a significant reduction in creditor calls and letters.

- Through your Trust Account deposits, you will automatically accumulate funds to be used to resolve your Claims.

- The Client Services Team will help you every step of the way!

Remember, regarding our legal services, the faster you can accumulate funds, the faster our firm can attempt to reach a resolution with your creditors. In months when you have excess funds, you can deposit more into the firm's trust account and we can then work to reach resolutions quicker. You have total control. To help you understand the process, we are enclosing a Truth-in-Service Disclosure Statement. Please keep in mind that this is an illustration only, and your actual results will vary depending upon the factors listed in the disclosure statement. We hope you find this helpful.

Also, once you are represented by the Law Firm, specific laws may apply as to how a debt collector may contact you. Any creditor who violates your legal rights may be held liable to pay you for its violations. All you need is a law firm with aggressive lawyers who know how to apply the law to your advantage. That's our job.

To immediately commence our law firm's representation, please sign the attached documents as instructed by our Intake Group representative.

Thank you for choosing our firm to help you resolve your debt problems and allowing us to provide you with the peace of mind you deserve.

If you have any questions, please contact us toll free at 1(909) 610-8316.

Best Regards,

Karen Salapare
Client Intake Representative
On behalf of Philip Sellers, P.C.

## LEGAL SERVICE AGREEMENT

verify the actual balance of the Claims by all commercially reasonable means including contacting the Creditor holding the debt. If the balance of the Claims, as verified by Law Firm ("The Verified Balance"), is materially different than the balance as previously reported by Client, than such "Verified Balance" shall be utilized for the purpose of determining the Fixed Legal Fee due to Law Firm, and the Client will be notified by the Law Firm of any change to the amount of the Fixed Legal Fee. Except as otherwise described in this agreement, the Fixed Legal Fee will include costs incurred by the Law Firm for legal fees and third party expenses. All fees are not set by law but are negotiated by the Law Firm and Client.

*C)* Recognizing the Client's financial situation requires the Legal Fees described in the preceding paragraphs be paid to the Law Firm by paying an initial amount of **$400.00** and then the balance being paid in installments, Client hereby agrees the Law Firm will deduct up to **$657.84**, or the balance of the initial amount whichever is greater, from the Client's Trust Account in the first month of the Law Firm's Representation and then up to **$400.00**, or the balance of the initial amount, whichever is greater, in the second and all sucessive months. Once the initial amount above has been paid, then up **$200.00** will be deducted in all successive months until the balance of the Legal Fee describe in the preceding paragraphs has been paid.

**The legal fees described in the above paragraph E. 1 are strictly for professional consultation and assistance related to debt collection and creditor rights and responsibilities and are consistent with the principles expressed in the ABA MODEL RULES OF PROFESSIONAL CONDUCT, Client-Lawyer Relationship, Rule 1.5, Fees. No Legal Fees under paragraph E.1 are being charged for Debt Relief Services as defined in the Telemarketing and Consumer Fraud and Abuse Prevention Act,15 U.S.C. 6101-6108, PART 310 TELEMARKETING SALES RULE 16 CFR PART 310 (§§ 310.1 - 310.9).**

2. **Litigation Related Legal Fees:**

*A)* Client acknowledges that the services described in paragraph B.2.A and B.2.B of this Legal Service Agreement are not a part of the services being provided by this agreement and would require that:

i. Client and Law Firm execute an additional separate written agreement;
ii. Such representation will include an additional Law Firm fee.
iii. Client is responsible for all court costs for defense of collection actions.

*B)* Client understands that the Law Firm will not charge the Client any fees for services provided in paragraph B.2.C of this Legal Service Agreement.

*C)* For additional informaion regarding Litigation Related Legal Services please refer to paragraph B.2 of this Legal Service Agreement.

**The legal fees described in the above paragraph E. 2 are strictly for collection harassment and debt collection litigation related to the Claims and are consistent with the principles expressed in the ABA MODEL RULES OF PROFESSIONAL CONDUCT, Client-Lawyer Relationship, Rule 1.5, Fees. No Legal Fees under paragraph E.2 are being charged for "Debt Relief Services" as defined in the Telemarketing and Consumer Fraud and Abuse Prevention Act,15 U.S.C. 6101-6108, PART 310 TELEMARKETING SALES RULE 16 CFR PART 310 (§§ 310.1 - 310.9).**

3. **Debt Relief Services:**

*A)* Client understands that if, any Claim with a creditor is compromised, modified or otherwise altered, it is understood that the Law Firm will not charge the Client any fees for the Debt Relief Services performed.

**The client understands that the Law Firm will not charge the Client any fees for "Debt Relief Services" as defined in the Telemarketing and Consumer Fraud and Abuse Prevention Act,15 U.S.C. 6101-6108, PART 310-TELEMARKETING SALES RULE 16 CFR PART 310 (§§ 310.1 - 310.9) as well as other state laws. The Law Firm does not claim or imply that it can renegotiate, settle, or in some way change the terms of your debt to an unsecured creditor or debt collector. If, any Claim with a creditor is compromised, modified or otherwise altered, it is understood that the Law Firm will not charge the Client any fees for the Debt Relief Services performed in paragraph E.3.**

4. **Disposition of Excess Funds:** At the conclusion of our services, all excess funds, net of fees earned, approved but unpaid amounts due to creditors and other third party expenses will be returned to Client within 14 business days.